**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

NIGEL CLARKE,

                                        Petitioner,

            - v -                                       Civ. No. 9:05-CV-1411
                                                              (GTS/RFT)

THOMAS POOLE, ELIOT SPITZER,

                                        Respondents.

**APPEARANCES:**                            **OF COUNSEL:**

NIGEL CLARKE
Petitioner, *Pro Se*
00-A-5653
Five Points Correctional Facility
State Route 96
P.O. Box 119
Romulus, NY 14541

HON. ANDREW M. CUOMO                    PAUL M. TARR, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Respondent
120 Broadway
New York, NY 10271

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

<u>**REPORT-RECOMMENDATION and ORDER**</u>

        *Pro se* Petitioner Nigel Clarke brings this Petition for a Writ of *Habeas Corpus*, pursuant to

24 U.S.C. § 2254, alleging that his present confinement is in violation of the Constitution of the

United States.  Clarke raises the following grounds in his Petition: (1) ineffective assistance of trial

counsel; (2) ineffective assistance of appellate counsel; and (3) denial of a notice of the charges

brought against him due to the trial court's misunderstanding and misapplication of the law related

to dual counts of intentional and depraved indifference murder.  Dkt. No. 27, Second Am. Pet.  For

the reasons that follow, it is recommended that the Petition be **denied**.

## I. BACKGROUND

On November 26, 1999, Cameron Knight was killed in Hudson, New York. Nearly a month later, on December 23, 1999, Petitioner was arrested pursuant to an outstanding seizure warrant for a violation of probation. While in police custody pursuant to the probation violation, Petitioner was questioned about Cameron Knight's murder. Thereafter, on March 16, 2000, Petitioner was indicted on two counts of Murder in the Second Degree, one for intentional murder under N.Y. PENAL LAW § 125.25(1), and one for depraved indifference murder pursuant to N.Y. PENAL LAW § 125.25(2), and on one count of Criminal Possession of a Weapon in the Second Degree pursuant to N.Y. PENAL LAW § 265.03.

At trial, the following testimony was adduced. Kevin Francis testified that on November 26, 1999, he was riding in a Ford Explorer with Petitioner and another man nicknamed "Splurge," on their way to a convenience store. Dkt. No. 36, State Court R. on Appeal (hereinafter "R."), Trial Tr., dated at Aug. 8-15, 2000, at pp. 332-34. After driving around the city of Hudson, Petitioner, who was driving, pulled the car over behind two parked cars that were facing each other on the same side of the street. *Id.* at pp. 340-41. At that time, around 10:30 p.m., Michael Merrit and Cameron Knight, a/k/a "Dutch," were changing a tire on one of the parked cars while using the headlights of the other for illumination. *Id.* at pp. 520-21. Merrit testified that the an SUV pulled in behind the car they were working on, and he saw a stocky and bald black male get out of the driver's seat and walk up to Knight. *Id.* at pp. 522-24. According to Merrit, the two men exchanged words and the driver punched Knight, who jumped back and turned to run away. *Id.* at p. 523. At that point, the baldheaded driver brandished a gun and fired three or four shots at Knight, who collapsed on the

street and began to crawl over to the curb.  *Id.* at p. 525.

Kevin Francis, who was riding in the car with Petitioner and Splurge,  testified that Petitioner got out of the car and walked towards where a black man and a black woman were standing near the side of the road, and that he saw Petitioner swing and hit the man.  *Id.* at 343.  Francis stated that he heard "a loud click, click like a bullet being chambered," and then heard several "pops" from gunfire, after which he saw the black male fall on the street and Petitioner turn around with a gun in his hand and start running back towards the car.  *Id.* at p. 344-46.

Keisha Barrett, Knight's fiancé, testified that on the date of the crime, she observed an altercation between Knight and a baldheaded stocky man from a second-story window in their house, at which point she proceeded downstairs and heard gunshots fired.  *Id.* at pp. 303-04.  After hearing the gunshots, Barrett went to a window on the first floor and saw the baldheaded stocky man walking to the sport utility car with a gun in his hand.  *Id.* at p. 305.

Francis testified that after Petitioner returned to the car, he began to yell at Petitioner, prompting Petitioner to point a gun at him at tell him to "get the f - - k out," at which point Francis exited the vehicle, followed by Splurge.  *Id.* at p. 348-52.

Bridget Marie Masesie, a friend of Petitioner's girlfriend Billie Jo Weed, testified that at about 11 p.m. on the night of the murder, Petitioner came over to her trailer home and was acting nervous, "pacing back and forth," and repeatedly said "I f - - -ked up, I f - - -ked up."  *Id.* at pp. 509-10.  Nector DeJesus, an acquaintance of Petitioner's, testified that he arrived at Masesie's home later that night, whereupon Petitioner asked DeJesus to drive him to New York City, but he refused.  *Id.* at pp. 571-72.  Instead, DeJesus gave Petitioner and Billie Jo Weed a ride to Albany, New York, during which he heard Petitioner say that the gun was "in a safe spot."  *Id.* at pp. 573-76.  Sherri

Weed, Billie Jo Weed's sister, testified that she met up with her sister and Petitioner at a bar in Albany on the night of the murder.  Sherri rented a room for Petitioner and her sister at a hotel, and at one point overheard Petitioner stated that he "had to stay out of Hudson and lay low."  *Id.* at pp. 596-98.  Petitioner was arrested on December 23, 1999.  Trial Tr. at pp. 704-05.

On August 15, 2000, a jury convicted Petitioner of intentional Murder in the Second Degree, and Criminal Possession of a Weapon in the Second Degree.  Petitioner was thereafter sentenced to concurrent prison terms of twenty-five (25) years to life and fifteen (15) years for the murder and weapons charges, respectively.  *People v. Clarke*, 772 N.Y.S. 2d 630 (N.Y. App. Div. 3rd Dep't 2004).

On September 21, 2001, Petitioner moved to vacate the conviction pursuant to N.Y. CRIM. PROC. LAW ("CPL") § 440.10. R., Ex. B,  Pet'r First Mot. to Vacate, dated Sept. 21, 2001.  The Columbia County Court denied that motion.  *Id.*, Ex. D, Order dated July 17, 2002.  Thereafter, Petitioner moved for leave to appeal the denial of his motion to vacate and to consolidate that collateral attack with his direct appeal, which was granted by the Appellate Division.  *Id.*, Exs. E, Mot. for Leave to Appeal and Consolidate dated July 30, 2002, & F, Order Granting Leave to Appeal dated Sept. 10, 2002.

Petitioner filed his consolidated direct appeal before the Appellate Division, which affirmed his conviction.  R., Exs. G, Pet'r Br. on Appeal & I, Order, dated Mar. 4, 2004; *People v. Clarke*, 772 N.Y.S. 2d 630.  Petitioner's subsequent application for leave to appeal to the Court of Appeals was denied on May 28, 2004.  *People v. Clarke*, 781 N.Y.S. 2d 296 (N.Y. Ct. App. 2004).

On January 25, 2005, Petitioner filed a writ of error *coram nobis* before the Appellate

Division,[1] which was summarily denied on April 13, 2005.  R., Exs. M, Pet. dated Jan. 25, 2005, & N, Order dated Apr. 13, 2005.[2]  On July 14, 2005, the Court of Appeals denied Petitioner's application for leave to appeal the Appellate Division's denial of his petition for a writ of error *coram nobis*.  *Id.*, Ex. Q, Order dated July 14, 2005.

Clarke's first *Habeas* Petition before this Court, signed on October 21, 2005, was filed on November 14, 2005.  Dkt. No. 1, Pet.  On November 17, 2005, this Court directed Petitioner to file an amended petition because he had not provided "the filing date of each individual state-court challenge, or the filing and final date of any appeals therefrom," preventing us from determining whether the one-year statute of limitations (SOL) for *habeas* petitions under 28 U.S.C. § 2222(d)(1) had expired.  Dkt. No. 3, Order dated Nov. 17, 2005 (emphases omitted).  Petitioner filed an Amended Petition on December 2, 2005, in compliance with the Court's November 17th Order.  Dkt. No. 4.  First Am. Pet.

In December 2005, Petitioner requested that his *habeas* action be stayed so that he could exhaust his state court remedies with respect to an ineffective assistance of counsel claim.  Dkt. No. 7, Lt. dated Dec. 26, 2005.  This Court granted such request, staying his *Habeas* Petition.  Dkt. No. 8, Order dated Mar. 7, 2006.  On April 3, 2006, Petitioner filed a second petition for a writ of error *coram nobis* with the Appellate Division, which was summarily denied.  R., Exs. R, Second Pet. for Writ of Error *Coram Nobis* dated Apr. 3, 3006, & U, Order dated July 5, 2006.  Petitioner's application for leave to appeal that decision to the Court of Appeals was denied.  *Id.*, Ex. W, Order

---

[1] On that same date, Petitioner also filed a second motion to vacate his judgment pursuant to CPL § 440.10, however, Petitioner later withdrew that motion with the trial court's permission.  R., Ex. L, Order dated Apr. 27, 2005.

[2] We note that exhibit N of the State Court Record found in Docket Number 16 has been labeled "Motion to Vacate Pursuant to CPL M."  *See* Dkt. No. 16.  We will nonetheless refer to it as exhibit N.

dated Sept. 18, 2006.

In a letter to this Court dated September 27, 2006, Petitioner again requested an extension of the stay of his *habeas* action in order to proceed back to the trial court to challenge the constitutionality of his "twin count" indictment on both intentional and depraved indifference murder. Dkt. No. 13, Lt. dated Sept. 27, 2006. This Court granted said request "[i]n light of recent developments in state court regarding the definition and elements of depraved indifference murder." Dkt. No. 14, Order dated Jan. 22, 2007.

On February 21, 2007, Petitioner filed his third CPL § 440.10 motion to vacate the judgment on the grounds that his twin count indictment for both intentional and depraved indifference murder deprived him of constitutionally adequate notice of the charges against him and prevented him from presenting a defense. R., Ex. X, Pet'r Third § 440 Mot. The trial court denied Petitioner's third CPL § 440 Motion, holding that the developments in New York jurisprudence regarding depraved indifference murder were "not to be retroactively applied." *Id.*, Ex, BB, Order dated Aug. 31, 2007, at p. 2. Petitioner's motion for leave to appeal that decision was denied by the Appellate Division. *Id.*, Ex. DD, Order dated Nov. 27, 2007.

On May 14, 2008, this Court lifted the extended stay and granted Petitioner permission to submit a second amended petition that would completely supercede and replace his First Amended Petition. Dkt. No. 26, Order. Petitioner's Second Amended Petition was filed on June 10, 2008. Dkt. No. 27.

## II. DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110

Stat. 1214 (1996)  ("AEDPA"), a federal court may not grant habeas relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable application, of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Hawkins v. Costello*, 460 F.3d 238 (2d Cir. 2006); *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Miranda v. Bennett*, 322 F.3d 171, 177-78 (2d Cir. 2003); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001).

The petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York*, 2003 WL 22234679, at *3 (S.D.N.Y. Aug. 28, 2003).  The AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d at 66; *Boyette v. LeFevre*, 246 F.3d at 88 (quoting § 2254(e)(1)) (internal quotations omitted).

The Second Circuit has provided additional guidance concerning application of this test, noting that:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief:  1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams and Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

**B. Dual Charge of Intentional and Depraved Indifference Murder**

1. *Timeliness*

Respondent challenges the timeliness of Petitioner's claim that he was not provided constitutionally sufficient notice of the charges against him due to the trial court's misunderstanding and misapplication the law related to depraved indifference murder.[3]

In accordance with the provisions of the AEDPA, federal *habeas* petitions challenging a state court judgment are subject to a one-year statute of limitations ("SOL"). Specifically, 28 U.S.C. § 2244(d) provides:

> (1) A one year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of –
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
> (2) The time during which a properly filed application for State postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

A judgment of conviction becomes final under the AEDPA at the conclusion of the ninety (90) days during which the party could have sought *certiorari* in the United States Supreme Court. *Hughes v. Irvin*, 967 F. Supp. 775, 778 (E.D.N.Y. 1997) (citing Rule 13 of the Rules of the Supreme Court of the United States); *Allen v. Hardy*, 478 U.S. 255, 258 n.1 (1986) (decision becomes final "where

---

[3] Respondent does not challenge the timeliness of Petitioner's other two claims, and further concedes that all three claims have been properly exhausted in state court. Dkt. No. 34, Resp't Mem. of Law at pp. 22-28.

the availability of appeal [is] exhausted, and the time for petition for certiorari ha[s] elapsed."). The one-year limitations period is tolled during the pendency of a properly filed application for post-conviction or other collateral review. 28 U.S.C. § 2244(d)(2). However, the AEDPA's tolling provision does not operate so as to restart the one-year limitations period at the conclusion of the state court proceedings. *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).

In this case, Petitioner's direct appeal, which was combined with his first CPL § 440 motion, was denied on May 28, 2004. *People v. Clarke*, 781 N.Y.S. 2d 296. Petitioner's conviction became final on August 26, 2004, ninety (90) days after the Court of Appeals denied Petitioner's direct appeal. *Hughes v. Irvin*, 967 F. Supp. at 778. However, the one-year SOL was tolled during the pendency of Petitioner's first *coram nobis* application, from January 25, 2005, the date it was filed, through July 14, 2005, the date the Court of Appeals denied leave to appeal, a total of 170 days.[4] Thus, with the addition of the 170 day tolling period, the SOL, as calculated from the date Petitioner's judgment became final under 28 U.S.C. § 2244(d)(1)(A), expired on February 13, 2006. As such, Petitioner's first *Habeas* Petition, dated October 21, 2005, was timely.

However, Petitioner did not raise his claim regarding the allegedly improper dual charge of both intentional and depraved indifference murder in his first Petition, and the filing of said Petition did not toll the SOL. *See Duncan v. Walker*, 533 U.S. 167 (2001) (holding that a federal *habeas* petition does not fall under the tolling provision of 28 U.S.C. § 2244(d)(2)); Dkt. No. 1, Pet. Nor does this claim relate back to the claims raised in Clarke's first *Habeas* Petition as it did not arise "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original

---

[4] Petitioner also filed his second CPL § 440 motion on January 25, 2005, which simultaneously tolled the SOL from that date until April 27, 2005, the date the trial court accepted Petitioner's withdrawal of that motion. *See supra* n. 2.

pleading."[5]  FED. R. CIV. P. 15(c)(2); *see also Mayle v. Felix*, 545 U.S. 644, 662 (2005) ("If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.").  Petitioner's dual charge claim was first mentioned in his September 27, 2006 letter asking the Court to extend his stay, well after the SOL accrued on February 13, 2006.  Dkt. No. 13. Thus, Petitioner's third claim is untimely under 28 U.S.C. § 2244(d)(1)(A).

However, under 28 U.S.C. § 2244(d)(1)(D), the SOL can also run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  Petitioner argues that the factual predicate for this claim was the Court of Appeals' decision in *People v. Feingold*, 7 N.Y.3d 288 (2006), and therefore, that the SOL should run from the date of that decision, in which case his claim would be timely.  *Feingold* was one of several recent decisions by the Court of Appeals concerning the correct application of N.Y. PENAL LAW § 125.25(2), which defines the crime of second-degree depraved indifference murder.[6] Generally, these cases grappled with the application of N.Y. PENAL LAW § 125.25(2) in murder cases where the prosecutor charged the defendant with both intentional and depraved indifference murder in the alternative, and the jury acquitted on the intentional murder charge and convicted on the depraved indifference murder charge despite evidence ringing of intentional murder.[7]  *See*

---

[5] Clarke raised the following grounds for relief in his first *habeas* Petition: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; and (3) the integrity fo the grand jury proceeding was impaired by the People's failure to disclose exculpatory evidence.  Dkt. No. 1, Pet.

[6] N.Y. PENAL LAW § 125.25(2) states that a criminal defendant is guilty of second-degree murder when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[7] For a chronological summary of these decisions, reference is made to the Honoroable Judge G.B. Smith's decision in *Feingold*. 7 N.Y.3d at 290-97.

*People v. Hafeez*, 100 N.Y.2d 253 (2003) (reversing depraved indifference murder conviction when defendant was an accomplice to a co-defendant who stabbed the victim in the heart); *People v. Gonzales*, 1 N.Y.3d 464 (2004) (holding depraved indifference murder conviction lacked evidentiary support where defendant was alleged to have shot victim 10 times at close range); *People v. Payne*, 3 N.Y. 3d 266 (2004) (reversing depraved indifference murder conviction and stating that recent cases "have made it clear that depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York"); *People v. Suarez*, 6 N.Y. 3d 202 (N.Y. 2005) (reversing depraved indifference murder conviction when defendant stabbed his girlfriend several times).

In *Feingold*, the Court of Appeals held that "depraved indifference to human life is a culpable mental state," explicitly abrogating its previous holding in *People v. Register*, 60 N.Y.2d 270 (1983), that the New York State Legislature "did not intend that a mens rea element beyond mere recklessness be included in the definition of depraved indifference murder." Although the Court of Appeals did not explicitly recognize its overruling of *Register* until *Feingold*, several decisions published prior to *Feingold* "pointed the law in a different direction." 7 N.Y.3d at 292.

In one such decision, *People v. Payne*, the defendant was charged with both intentional and depraved indifference murder. 3 N.Y. 3d 266. The evidence was that the defendant went to the victim's house and shot him at point blank range. In reversing the Defendant's conviction for depraved indifference murder, the Court of Appeals stated that its "recent holdings . . . have made it clear that depraved indifference murder may not be properly charged in the overwhelming majority of homicides that are prosecuted in New York. While we have identified instances in

which a killing could qualify as depraved indifference murder, a point-blank shooting is ordinarily not one of them." 3 N.Y. 3d at 270.

Thus, as least as early as *Payne* in 2004, the Court of Appeals had clearly identified the impropriety of charging a criminal defendant with both intentional and depraved indifference murder in the majority of homicide cases,[8] although it did not specifically recognize the element of "depraved indifference" as a mental state until *Feingold* in 2006. In her dissent in *Policano v. Herbert*, a decision addressing questions for certification from the Second Circuit Court of Appeals, former-Chief Judge Judith Kaye stated that the pre-*Feingold* decisions had not changed the established rule that "intentional murder and depraved indifference murder are inconsistent crimes." *Policano v. Herbert*, 7 N.Y. 3d 588, 605 (2006) (Kay, J. dissenting in part). For Judge Kaye, the only change in *Feingold* was the redefinition of "depraved indifference" from an objective element to a subjective *mens rea* element, not a change in the aforementioned rule. *Id*; *see also Soto v. Conway*, 565 F. Supp. 2d 429, 433-34 (E.D.N.Y. 2008) (generally agreeing with former-Chief Judge Kaye's dissenting opinion in *Policano v. Herbert*, 7 N.Y. 3d 588 (2006) in which she identified "two distinct threads in [the Court of Appeals'] developing depraved indifference murder jurisprudence").

For the purposes of rendering a decision on the timeliness of this claim, it is unnecessary for this Court to determine whether the Court of Appeals' pre-*Feingold* decisions in *Hafeez*, *Gonzales*, *Payne*, and *Suarez*, represented a change in the law, or simply an application of a preexisting standard.

---

[8] Under *Feingold*, there are still rare situations in which a criminal defendant could be properly charged with both intentional and depraved indifference murder, and have both charges properly submitted to the jury in the alternative. *See, e.g.*, *Fore v. Ercole*, 594 F. Supp. 2d 281 (E.D.N.Y. 2009) (finding that both intentional and depraved indifference murder charges were properly presented to the jury in the alternative under *Feingold* when there was testimony that the defendant closed his eyes, flinched, and fired in the direction of the victim).

Petitioner appears to raise two separate claims related to his depraved indifference charge. First, Petitioner asserts that "he was denied notice of the charges against him" because at the time he was tried in 2000, "none of the parties, nor the court, correctly understood the meaning of 'circumstances evincing a depraved indifference to human life,'" as was later redefined in *Feingold*. Second, Petitioner alleges that his Sixth Amendment rights were "violated by virtue of the multi-count murder indictment inclusive of both intentional and depraved indifference murder." Second Am. Pet. at p. 7. The Court of Appeals made clear in *Payne* that in most cases involving a one-on-one killing, a defendant should not be charged with both intentional and depraved indifference murder; thus, as of *Payne*, Petitioner was given sufficient notice of that rule. Therefore, as to his second claim that the dual count charge violated his constitutional rights, the SOL began to run on October 19, 2004, the date the *Payne* decision was issued, and, with the addition of the 170 days during which SOL was tolled while he pursued his appeals, expired on April 7, 2006. Petitioner first mentioned this claim in a September 27, 2006 letter to the Court asking for an extension of his stay. Dkt. No. 13. Therefore, Petitioner's claim that he was improperly charged with both intentional and depraved indifference murder is untimely and should therefore be **dismissed** pursuant to 28 U.S.C. § 2244(d)(1)(D).

As to Petitioner's first dual charge claim, he is correct that the Court of Appeals did not expressly define "depraved indifference" as a subjective *mens rea* element until the *Feingold* decision was issued on July 5, 2006, and therefore, his claim that he was denied notice of the charges against him is timely because he advised the Court of his intent to exhaust that claim in his September 27, 2006 letter. We consider that claim below.

2. *Notice of the Charges*

Petitioner claims that he was denied notice of the charges against him because at the time he was tried, the courts were not applying the correct definition of "depraved indifference" as annunciated in *Feingold*. However, the Court of Appeals has held that the holdings of *Feingold* are not to be applied retroactively, *Policano v. Herbert*, 7 N.Y. 3d at 589, and therefore, such holdings may not be used as a basis for granting *habeas* relief. *See Rustici v. Phillips*, 497 F. Supp. 2d 452, 485 (E.D.N.Y. 2007). Because *Feingold* does not apply retroactively, this Court is bound to look to the law as it existed at the time of Petitioner's conviction in the year 2000 in assessing the merits of his claim. *See Flowers v. Fisher*, 296 Fed. Appx. 208, 210 (2d Cir. 2008) ("We look to New York law as it existed at the time [petitioner's] conviction became final, as the New York Court of Appeals has found that although the law on depraved indifference has changed significantly in recent years, those changes do not apply retroactively." (citing *Policano*)). In that respect, Petitioner does not argue that the trial court applied incorrect legal standards as they existed in the year 2000. Furthermore, Petitioner does not allege that he was not provided notice of the crimes charged against him as they were defined in the year 2000.

Therefore, Petitioner's claim that he was denied notice of the charges brought against him is without merit and should be **dismissed**.

### C. Ineffective Assistance of Counsel

Petitioner raises two claims that his Sixth Amendment rights were violated due to ineffective assistance of counsel, one against his trial attorney and another against his appellate attorney. We consider these claims separately.

#### 1. *Ineffective Assistance of Trial Counsel*

Petitioner alleges that his trial counsel "failed to pursue or investigate [his] sham or ruse

arrest." Second Am. Pet. at p. 5.  According to Petitioner, he was arrested while in the house of a third party that the police entered "without a search warrant, consent or exigent circumstances." *Id.* The Appellate Division addressed and rejected this claim on Petitioner's direct appeal, stating that Petitioner's "arrest was based on an outstanding bench warrant for a probation violation and cannot be characterized as a sham merely because, after he was taken into custody, the police were more interested in questioning him about a different and graver crime." *People v. Clarke*, 772 N.Y.S. 2d at 632 (internal citations and quotation marks omitted).

   To establish ineffective assistance of counsel, a *habeas* petitioner must show 1) counsel's representation fell below an objective standard of reasonableness measured by the prevailing professional norms; and 2) prejudice, i.e., there is a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 688 & 694 (1984) (cited in *Bell v. Cone*, 535 U.S. 685, 695 (2002)); *see also Aeid v. Bennett*, 296 F.3d 58, 62-63 (2d Cir. 2002); *Brown v. Artuz*, 124 F.3d 73, 79-80 (2d Cir. 1997); *Rattray v. Brown*, 261 F. Supp. 2d 149, 157 (E.D.N.Y. 2003).[9]  In determining the reasonableness of counsel's conduct courts must  "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  *Strickland v. Washington*, 466 U.S. at 689.

   In his Memorandum of Law,[10] Petitioner admits that he was arrested pursuant to a bench

_____

   [9] In *Williams v. Taylor*, the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law[.]'"  529 U.S. 362, 391 (2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 309 (2d Cir. 2001).

   [10] Petitioner did not submit a memorandum of law along with his Second Amended Petition despite this Court's admonishment that his Second Amended Complaint would replace, *in toto*, his previous complaints.  *See* Dkt. Nos. 26, Order (stating that "**amended pleadings must be complete pleadings** which will supersede the original pleadings in all respects." (emphasis in original)), & 27, Second Am. Pet. However, in the interest of justice, and because Petitioner asks the Court to do so in his Reply, the Court will consider Petitioner's previous Memorandum of Law submitted in
(continued...)

warrant based on his violation of the conditions of his probation, but states that the police improperly relied on that warrant "as legal authority to enter the home of a third party based on their suspicion that petitioner 'might' be a guest there."  Dkt. No. 6, Pet'r Mem. of Law at p. 10. Petitioner complains that "defense counsel did not even request a *Mapp/Dunaway*[11] type hearing on probable cause with respect to his client's arrest."  *Id.* at p. 6.  However, Petitioner does not allege, and nothing in the record suggests, that there was any constitutional deficiency in the bench warrant issued for his arrest.  In fact, Petitioner stated in his first CPL § 440 motion that "the Supreme Court, Bronx County issued a bench warrant for defendant's arrest, *because he violated his conditions of probation*" and that "the bench warrant embodied a judicial finding that there was probable cause to believe that defendant violated his conditions of probation, and the warrant authorized the police to seize defendant." *See* R., Ex. B, Pet'r First § 440 Mot. at ¶ 15 & 18 (emphasis added); *see also* R., Ex. C, Opp. to Pet'r First § 440 Mot. at ¶ 6 ("The defendant has never claimed that the arrest warrant in question was invalid or otherwise defective.").

Once Petitioner was lawfully arrested pursuant to the outstanding warrant, the police were not foreclosed from questioning him regarding an unrelated crime.  *See, e.g., Burress v. Henderson*, 814 F. Supp. 313, 324 (W.D.N.Y. 1993); *see also People v. Fulton*, 683 N.Y.S. 2d 646, 648 (N.Y. App. Div. 3rd Dep't 1999) ("Defendant's otherwise lawful arrest . . . cannot be characterized as a sham merely because, after he was taken into custody, the police were more interested in questioning him about a different and graver crime." (internal citations and quotation marks omitted)).  To the

---

[10](...continued)
support of his first Amended Petition. *See* Dkt. No. 6, Pet'r Mem. of Law.

[11] *See Mapp v. Ohio*, 367 U.S. 643 (1961) & *Dunaway v. New York*, 442 U.S. 200 (1979).  A *Mapp/Dunaway* pre-trial hearing is used to decide whether evidence was obtained in violation of the Fourth Amendment.

extent Petitioner is asserting that his arrest warrant violated the Fourth Amendment rights of third

parties because police entered their home without consent, he would not have had standing to make

such a claim at trial. *See United States v. Pabon*, 2009 WL 765019, at *6 (N.D.N.Y. Mar. 24, 2009)

(noting that a defendant subject to a valid seizure warrant does not have greater Fourth Amendment

rights in a third party's home than he would in his own home); *see also Rakas v. Illinois*, 439 U.S.

128, 133-34 (1978) ("A person who is aggrieved by an illegal search and seizure only through the

introduction of damaging evidence secured by a search of a third person's premises or property has

not had any of his Fourth Amendment rights infringed." (*citing Alderman v. United States*, 394 U.S.

165, 174 (1969)).

Petitioner's citation of *Steagald v. United States*, 451 U.S. 204 (1981) does not aid his

argument.   In that case, police obtained an arrest warrant for a suspect who they believed was

located in the home of the defendant, a third party.  Without a search warrant, the police entered the

defendant's home and found drugs and other incriminating evidence, but not the suspect they were

searching for.  The Supreme Court sustained defendant's argument that the search of his home was

unlawful, as it was done without a proper search warrant and absent consent or exigent

circumstances.  451 U.S. at 215-16.  In Petitioner's case, *he* was the subject of the arrest warrant,

not the third party.   Under *Steagald*, the person(s) with a privacy interest in the home in which

Petitioner was found might have a cause of action under the Fourth Amendment, but Petitioner does

not.  Similarly, Petitioner's reliance on *Minnesota v. Olson*, 495 U.S. 91 (1990), is also misplaced.

In that case, the Supreme Court held that the defendant, who was an overnight guest in the home of

a third party, had a reasonable expectation of privacy that was protected by the Fourth Amendment,

and therefore that the defendant's *warrantless* arrest in the home of the third party was

unconstitutional.  In this case, the police obtained a valid search warrant prior to arresting Petitioner and therefore, his Fourth Amendment rights were not violated.

Therefore, the failure of Petitioner's trial counsel to make such meritless arguments does not fall below an objective standard of reasonabless and could not have prejudiced Petitioner.  *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (failure to raise a meritless claim "does not fall outside the wide range of professionally competent assistance to which Petitioner was entitled." (internal quotation marks and citations omitted)).

Therefore, it is recommended that the Petition be **denied** on this ground.

### 2. *Ineffectiveness of Appellate Counsel*

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912, (1993).  Thus, Petitioner must demonstrate that the representation provided by appellate counsel (1) fell below an objective standard of reasonableness, and (2) that he would have likely been granted a new trial but for appellate counsel's defective representation.  *Mayo v. Henderson*, 13 F.3d 528, 536 (2d Cir. 1994).  The same presumption of reasonable professional assistance that is granted to trial counsel is also bestowed upon appellate counsel.  *Jennings v. United States*, 2007 WL 2027908, at *5 (N.D.N.Y. July 11, 2007).  In that respect, "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Mayo v. Henderson*, 13 F.3d at 533.

On appeal, Petitioner's counsel challenged his conviction on the following grounds: (1) the

prosecution committed *Brady*[12] violations by failing to disclose a composite sketch of Petitioner and by not disclosing the fact that a potential prosecution witness was unable to identify Petitioner in a photo array; (2) the trial court's erroneous *Sandoval*[13] ruling compromised Petitioner's right to testify due to the prejudice that would have befallen him had he done so; (3) the trial court's *Ventimiglia*[14] ruling improperly allowed the prosecution to submit evidence that Petitioner pointed a gun at Kevin Francis shortly after the murder; (4) trial counsel was ineffective because he did not timely challenge an improper jury impaneling and failed to object to the "sham" arrest; and (5) the sentence imposed was harsh and excessive.  R., Ex. G, Pet'r App. Br.

Petitioner alleges that his appellate counsel provided constitutionally ineffective representation because he "failed to raise obvious meritorious argument[s] on appeal," including: (1) the prosecutor's inflammatory summation; (2) an erroneous gun demonstration; (3) an erroneous "bare bones" identification charge; (4) a prejudicial response by the people's witness; and (5) numerous hearsay statements that were admitted into evidence.[15]  Second Am. Pet. at p. 5.

### 1. *Comments During Summation*

With respect to Plaintiff's argument that the prosecutor made inflammatory comments during summation that should have been one of the bases for appeal, after reviewing the trial transcript, the

---

[12] *Brady v. Maryland*, 373 U.S. 83 (1963).  In *Brady*, the Supreme Court held that the prosecution must turn over any evidence favorable to a criminal defendant.

[13] *See People v. Sandoval*, 314 N.E. 2d 413 (N.Y. Ct. App. 1974).  A *Sandoval* hearing is "an evidentiary hearing held to determine whether, if the defendant testifies, his prior convictions may be admitted to impeach his credibility."  *Shannon v. Senkowski*, 2000 WL 1683448, at *6 (S.D.N.Y. Nov. 9, 2000) (citing *Sandoval*).

[14] *See People v. Ventimiglia*, 52 N.Y. 2d 350 (1981).  A *Ventimiglia* hearing is held to determine whether evidence of uncharged crimes is admissible as direct evidence.

[15] These claims were raised in Petitioner's first *coram nobis* application, and were summarily denied without discussion by the Appellate Division, Third Department.  R., Ex. N, Order dated Apr. 13, 2005.

Court finds that the prosecutor's comments were largely within the realm of latitude afforded during summations, even if Petitioner objected to the inferences the prosecutor wished the jury to draw based on the evidence presented.  *See* Pet'r Mem. of Law at p. 20.  However, two comments highlighted by Petitioner warrant further comment.

Petitioner argues that the prosecutor improperly attempted to shift the burden when he stated "there has been no proof before you that anybody else committed a murder on November 26, 1999, not a man with braids and a bald spot . . . ."  Trial Tr. at p. 1012.  That comment spoke directly to Petitioner's defense theory that Splurge, a man with braids and a bald spot who was present at the crime scene, committed the murder.  The prosecutor's point was that all the available evidence pointed to Petitioner, not to another person.  *Id.* at pp. 1001-13; *see also id.* at p. 1001 (the prosecutor stated that "the defendant is under no obligation to prove anything to you . . . it is my job to prove this man killed Cameron Knight the day after Thanksgiving").  Such comment was not improper and would therefore not have been a strong basis for argument or appeal.

Petitioner also argues that appellate counsel should have challenged the prosecutor's references to what Petitioner *did not say* during his interview with police.  As Petitioner points out, the prosecutor improperly commented during summation on the fact that Petitioner did not assert his complete innocence or identify another person who was responsible for the murder during his interview with police.  Trial Tr. at p. 998 ("So when the defendant does talk to the police why doesn't he tell the police, 'I didn't shoot anybody?'") & 1000 ("Does this defendant ever say, 'Splurge did it'?").  Trial counsel objected to the remarks and the trial court sustained the objections in both instances.  *Id.*  Though improper, these remarks would have been subject to a harmless error analysis on appeal, which, given the evidence against Petitioner, would not have likely been

successful. *See People v. Crimmins*, 36 N.Y. 2d (1975) (*citing Chapman v. California*, 386 U.S. 18 (1967)).

Therefore, Petitioner's appellate counsel cannot be faulted for failing to raise these arguments on appeal.

### 2. *Erroneous Gun Demonstration*

Petitioner claims that appellate counsel should have argued that the prosecutor's in-court demonstration of a handgun was prejudicial. In this case, the actual murder weapon was never recovered. Trial Tr. at p. 736. The trial court permitted the prosecution to demonstrate how a handgun similar to the one used in the murder is loaded so that the jury could hear the slide and clicking of the bullets being chambered. *Id.* at pp. 734-41. According to Petitioner, this demonstration had no probative value and was highly prejudicial because it inflamed the jury. Pet'r Mem. of Law at p. 23. But, the trial allowed the demonstration based on its conclusion that it was relevant to the element of intent, because semi-automatic weapons need to be "cocked" before fired. *Id.* at p. 738. Given the rule in New York that exclusion of demonstrative evidence "rests largely with the discretion of the trial court," appellate counsel's failure to raise this claim was not objectively unreasonable. *Wesler v. Kassi*, 485 N.Y.S.2d 844 (N.Y. App. Div. 2nd Dep't 1985).

### 3. *Insufficiency of Identification Jury Charge*

Petitioner alleges that appellate counsel should have objected to the "bare bone identification charge" given by the trial court. Second Am. Pet. at p. 5. The relevant portion of the jury charge went as follows:

> Even if you are convinced, members of the jury, beyond a reasonable doubt that a crime has been committed, this does not end your deliberation with respect to any such crime that you might in your deliberations conclude has been committed. You must also be satisfied beyond a reasonable doubt that the defendant is the person who

*-21-*

committed it.  If in considering the evidence in the case you are not persuaded beyond a reasonable doubt that the identification of the defendant as being the person who committed the act alleged in the indictment . . . then in that event the prosecution will not have met its burden of proof and the jury's verdict must be one of not guilty.

Trial Tr. at pp. 1044-45.

Petitioner does not specify how this charge was insufficient.[16]  The trial court correctly stated that the prosecution had to prove beyond a reasonable doubt that it was Petitioner, and not another person, that committed the crime.  Therefore, an appeal based on this conclusory argument would not have likely been successful on appeal.

### 4.  *Prejudicial Testimony*

Petitioner alleges that appellate counsel should have argued that Detective Abitabile's testimony was unduly prejudicial.  Pet'r Mem. of Law at pp. 24-26.  On cross-examination, the following exchange occurred between Mr. Mott, Petitioner's trial attorney, and Detective Abitabile regarding Abitabile's pre-trial contact with Kevin Francis:

> Q.    Detective Sergeant, when was Mr. Francis contacted with respect to the requirement that he be at this [preliminary] hearing on the 28th of December?
>
> A.    I can't recall when, it had to be prior to the hearing.
>
> Q.    Well, from December 14th, the last time you saw him, up until the day of the hearing you don't know what he said by way of statements in this case, you don't know who, if anyone, he spoke to about the events of this case, do you?
>
> A.    I do not, no.
>
> Q.    And on the 28th before he testified at the preliminary hearing was that the first police contact that was had with him since the 14th of December?
>
> A.    I really can't remember.  I know I had been in contact with him over the phone just having him check in, make sure everything was okay.  *He feared for his life.*

Trial Tr. at pp. 119-220 (emphasis added).

Petitioner's trial counsel objected to Abitabile's response italicized above, but the trial court

---

[16] Unlike his other claims, Petitioner does not expand upon or even address this claim in his Memorandum of Law.  Dkt. No. 6.

overruled the objection, stating that Abitabile's comment "flowed rationally and understandably" from the question.  *Id.*

Although Abitabile's comment was clearly hearsay, given Francis's trial testimony that he did in fact fear for his life, any prejudicial effect resulting from that hearsay statement would have been harmless.  *Id.* at p. 352 & 354.  Therefore, appellate counsel did not provide deficient representation for not raising that argument.

### 5. *Hearsay Statements*

Petitioner claims that appellate counsel should have argued that several hearsay statements admitted into evidence deprived him of a fair trial.  Although he claims to have suffered from the admission of several hearsay statements, Petitioner cites only to hearsay statements made during the testimony of Sherri Weed, the sister of Petitioner's girlfriend, Billie Jo Weed.  Pet'r Mem. of Law at pp. 26-30.  Sherri Weed testified that on Saturday, November 26, 1999, the date of the murder, and the following day, she spent time with Billy Jo and Petitioner in and around Albany, New York.  Trial Tr. at pp. 592-618.  During her direct examination, Sherri Weed relayed several hearsay statements made by her sister during the course of those two days.  Petitioner's attorney objected to the introduction of these statements at trial, but those objections were overruled by the trial court on the grounds that they fell within the hearsay exception for statements made by an unavailable co-conspirator in the presence of the defendant.  *Id.* at pp. 622-24 & 660-665.

The testimony of Sherri Weed, which concerned only the actions of Petitioner and his girlfriend after the commission of the crime, was ancillary to the eye-witness testimony offered by the prosecution's other witnesses.  Therefore, even assuming the trial court's admission of these hearsay statements was in error, a challenge to the conviction on appeal based on their admission

would also have been subject to a harmless error analysis, which would not likely have been favorable considering the wealth of evidence against Petitioner produced at trial. *See, e.g., People v. Ayala*, 75 N.Y.2d 422, 448 (1990) (finding improper admission of hearsay testimony to be harmless when the case was based largely on unimpeached eyewitness testimony). Furthermore, Petitioner's trial attorney had the opportunity to question Billy Jo Weed about the veracity of statements she made when he called her as a witness for the defense. Trial Tr. at pp. 876-77.

In sum, we do not find that the arguments presented by Petitioner's appellate counsel were "clearly and significantly weaker" than the claims Petitioner alleges should have been raised. *Mayo v. Henderson*, 13 F.3d at 533. In that respect, we note that appellate counsel "does not have a duty to advance every nonfrivolous argument that could be made." *Id.* (citation omitted). Therefore, we find that Petitioner has not overcome the presumption that his appellate counsel provided constitutionally adequate representation, and we recommend that this claim be **dismissed**.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Second Amended Petition for a Writ of *Habeas Corpus* (Dkt. No. 27) be **DENIED**; and it is further

**RECOMMENDED**, that because the Court finds Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability should issue with respect to any of Petitioner's claims. *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000) *cert. denied* 531 U.S. 873 (2000); and it is further

*-24-*

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).

Date:   May 6, 2009
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge